Good afternoon. I would like to acknowledge and appreciate the court's order to consolidate our cases, and I would like to briefly explain our division of the argument. In the first ten minutes, I will address the O2 petition for review issues. Then co-counsel Mr. King of Lane Powell will address the O3 cross-appeal issues in approximately four minutes, including the recent government correspondence and our motion to supplement the record. And we will reserve six minutes for appeal before Your Honors. Thank you. May it please the Court, my name is Bernice Funk. I represent Sapua Hamoui with co-counsel. The Hamoui family is here in the front row in court today. In light of the briefing, the record, and the subsequent cases, we can simplify the problem at bar. The BIA applied an incorrect legal standard for relief under the United Nations Convention Against Torture. The BIA finds at page AR4 in the middle paragraph, quote, the Hamouis have failed to establish prima facie evidence of either persecution or torture by government officials, close quote. Persecution is irrelevant to a torture convention claim. Actually, Sapua Hamoui presents a prima facie case for torture convention relief, and evidence of this has not been recognized nor administratively heard. Today's three interrelated issues which I will address are one, the Hamouis' right not to be deported to torture in Syria as a matter of law, two, the agency requirement to evaluate the evidence so as to establish a record for judicial review if necessary, and three, the deprivation of the right to counsel, where the BIA concedes the facts and ignores the prejudice. The family has suffered bad lawyering for nine years. The U.N. Torture Convention requires that government examine any and all evidence of probable torture, 8 CFR 208.16C3. Here, the BIA unlawfully conflates the Asylum and Torture Convention claims, violating the rule of Camalthus and Ramsam Chiri in the Second Circuit. CAT and asylum claims are, quote, analytically separate, quote. All evidence about future torture should be considered apart from the findings in the asylum case. Country conditions play a decisive role in the alien meeting his burden of proof. Kazam makes clear that torture by governments like Syria cannot be overlooked by the BIA. Mr. Hamouis has presented substantial evidence that it is probable, if not certain, definitely more likely than not that he will be tortured in Syria. What is the prima facie case of torture convention relief? One of the things that the board seemed to have been looking at was whether the expert testimony that was proffered really went to Mr. Hamouis' circumstances or whether it was sort of generic to Syria in general. Yes, Your Honor. I'd like to address that specifically. Human Rights Watch Middle East expert Virginia Sherry at AR 3437, quote, If Mr. Hamouis were to be forcibly returned to Syria, it is highly likely that he and possibly his family will be detained upon entry to the country. Particularly given his file at Air Force Intelligence, torture and other forms of ill treatment can be expected. In such circumstances that prevail in Syria, there are no guarantees that Mr. Hamouis or even members of his family would be immune from what has been the unfortunate fate of so many other Syrians, including arbitrary arrest, incommunicado detention, and torture, quote. And I've got two other expert citations with this specific Hamouis quote. If I may respond to Your Honor's question. Dr. Ellis Goldberg, the University of Washington Middle East expert, has, quote, No doubt, quote, that's at AR 327, 328, quote, If sent back to Syria, it is more likely than not that Mr. Hamouis, as well as his family, will be detained and tortured, if not killed. Dr. Rashad Kassaba, University of Washington Middle East expert, finds, quote, Due to the widespread torture and arbitrary imprisonment practices of the Syrian government, the risk of torture and or disappearance, if Mr. Hamouis and his family were to be obliged to return to Syria, is substantial, quote. This evidence is overwhelming, and it's not generic. Even the human rights standard of the act is more likely than not. Yes, Your Honor. Yes. Has the BIA ever considered the CAC claim on the merits? No. Now, so which order of the BIA are we reviewing in the argument you're making? I believe it's August 2, 2002. And that's the one you quoted from where it conflated the standard for the CAC? Right. It's AR page 4, the middle paragraph. Let's sit right here. May I continue while you're looking? I have it. So if it's never considered the CAC claim, do they consider that for purposes of determining whether there was prejudice in the ineffective assistance of counsel claim, the prejudice prong? Do they consider the prejudice? Do they consider the merits of the claim when considering whether there was prejudice, whether there was an otherwise plausible ground for relief? Well, reasonable people can differ about this, but I submit that they did not consider the prejudice at all because they made the absurd finding that the CAC claim evidence was, quote, fully analyzed, quote, in 1997 when it was only propounded in 2002, and CAC relief didn't exist in 1997. So I hope that answers your question. These claims were fully analyzed in the immigration judge's decision, IJ, at 6-18. And you're saying that immigration judge's decision was before CAT was established? Yes, Your Honor. It didn't address the four affiants whose opinions you've submitted? Yes, Your Honor. And when did you ‑‑ was it the first motion to reopen or the second motion to reopen when the affidavits were submitted? The second motion to reopen was propounded in March of 2002. The first motion to reopen was by the ineffective counsel, Olson, in summer of 2000. And I am prepared to continue about torture relief or ineffective assistance. I thought that the expert testimony was submitted in your motion to reconsider the denial of the motion to reopen. Pardon me? I thought that the expert testimony was submitted with a motion to reconsider a denial of a motion to reopen. You moved to reopen based on CAT. Right. It was dismissed as untimely. And then you moved to have that reconsidered. Well, Your Honor ‑‑ I thought that it was untimely because of ineffective assistance of counsel. Actually ‑‑ Did I have that wrong? Well, actually, when I moved to reopen, the primary basis of the pleadings was ineffective assistance of counsel, which became obvious at the outset. Much of this evidence didn't come to me until a few weeks into representing the family. So I am clear that the initial evidence was the Lazada compliance about the ineffective counsel, and there was not much point to reconsider the first motion to reopen because it was totally deficient in theory and in filing and in every way. And this cited regulation, the relief requested, it was very bad. So I don't know if I answered ‑‑ For us, a motion to reconsider, though? No, it's a motion to reopen the case. Okay. I thought it was a motion to reconsider a denial of a motion to reopen. I doubt it, but I'll look at it, be prepared for a rebuttal. Would you prefer me to address the ineffective assistance or the ‑‑ I think the ineffective assistance is clear. I don't think that's the issue here. I think the issue really has more to do with whether there's a plausible claim for relief. I know what the government's argument is, so if you want to give some time to your co‑counsel and save time, maybe you should relinquish the time and save some rebuttal time. Have I already used 10 minutes? I still have a green light. You haven't used 10 minutes. I'd like to focus then more on the evidence of torture of Syria, if I could, just for a few more minutes. I'd like you to be aware of the State Department's own evidence in AR334335. Quote, there was credible evidence that security forces continued to use torture, including administering electrical shocks, pulling out fingernails, forcing objects into the rectum, sometimes while the victim is suspended from the ceiling, hyperextending the spine, using a chair that bends backward to asphyxiate the victim or fracture the victim's spine, end of quote. This is the government's own evidence. The finding that Mr. Hamoui has not established a prima facie torture convention claim is a question of law. It's reviewable de novo. I submit that the government has violated substantive and procedural due process. The facts of torture, relief, eligibility are reviewed for substantial evidence. Determinations that apply law to facts are nondiscretionary. Hernandez versus Ashcraft. In deciding whether the BIA determination comports with due process of law, this court does not defer to the agency. Mr. Hamoui has met his burden of proof, and the BIA should be reversed. The agency must evaluate the evidence and not mischaracterize or discount it. For a substantial number of individuals stepped forward and swore to the probability of torture, the collective weight of their declarations cannot be dismissed by the government. Villegas versus INS. The government's refusal to evaluate the prejudice of nine years of bad lawyering is manifest injustice. It's without substantial justification, and it violates the rule of Ramirez-Alejandre. It has been the rule for many years that discretion can only be properly exercised if the circumstances are considered. Okay, ineffective assistance is clear, but I would like to emphasize that the constitutional and statutory right to immigration counsel should not be vitiated in asylum cases and even more so in torture convention claims. Lynn versus Ashcroft. It's the pretense of counsels Hall, Salazar, and Olson that they were pursuing Hamoui's deportation defense, which deprived the family of their opportunity to retain actual competent counsel. When the family learned of the prior lawyer's deception and failings, they immediately moved to reopen before the BIA. The BIA recognized Elizada compliance in some of the prior counsel's failings but denied the prejudice. However, the prejudice is established by the evidence marshaled by competent counsel. Lynn versus Ashcroft. Any lawyer who tried could get the volunteer expert declarations, which were propounded in 2002. The remedy for bad lawyering is to set the case back in time to the date of hire of the ineffective counsel. To conclude, the government argues that Sathua Hamoui is not a person who follows the law, but this is totally false. When this court denied asylum in April 2000 on an inadequate record contaminated by bad lawyering, Sathua Hamoui prepared to leave the U.S. and sent the family passports for renewal to the Syrian embassy. The family passport was renewed. Sathua Hamoui was issued the Laissez-Passer passport one trip back to Syria only, AR-128. This belies the government claims that the family could voluntarily depart to elsewhere in the world, and it shows that Sathua Hamoui is wanted by a government that tortures and he is falsely accused. In actual fact, he is a man of the highest moral character. He follows the law as best he can. The government refusal to evaluate the Hamoui evidence and reopen this case is unlawful treatment of Muslim Arabs. Pardon me? The poor Afghans. Yes. Just remind me who they are again. I know there's a Professor Goldberg. Is it Goldberg? Ellis Goldberg. From UW. Rashad Kasaba from UW. Virginia Sherry, human rights watch, New York City, Middle East expert. And Rachel Campbell is a spokesperson for Amnesty International out of London. I don't know how much time you wanted to leave for the distinguished Mr. King, but I think he's got seven and a half minutes now. I see. Well, I guess I didn't have the proper red light at ten minutes in. No, no, it doesn't work that way. I was going to, but why don't we give your counsel his. Thank you. We didn't get to the remedy phase, but hopefully I'm rebuttal. Thank you. May it please the Court. My name is Michael King, and along with Diane Butler and Doug Smith, I'm the brief. I'm from Lane Palsperis Laburski here in Seattle. My responsibility was to address the 03 appeals. In light of consolidation and the course of the argument, I'm going to confine my comments to two points that arise out of the 03 issues, and that will include a discussion of the motion to supplement before I do, just so there isn't any confusion about the precise procedural posture under which the four declarations from the experts were submitted. The second motion to reopen was indeed a second motion to reopen. Undeniably, there was an element of reconsideration there. But it was a second motion to reopen because the thrust of the motion was not the Catt claim per se. It was the ineffective assistance of counsel, Mr. Olson's incompetence in his handling of the first motion to reopen. And I think it is important in that regard to keep the lens in mind here. We are working through the filter of ineffective assistance of counsel. The ineffectiveness is conceded. All we really got is a prejudice issue in this case, and we're going to apply Lim v. Ashcroft, and we're going to apply the test there and evaluate the evidence. And the declarations have been quite precisely identified. And in response to Judge Canby's question, just to supplement my counsel's comments, I think if you look at the declaration of Virginia Sherry, and from my side of the case, this is the excerpt of Record 29 and 30, there is a detailed discussion in Paragraphs 4 and 5 which tie the general conditions of Syria into the circumstances confronted by the Hamouis, and in particular Mr. Hamoui. And if you also look, and again, my side of the case, Excerpts of Records 7 and 8, this is Mr. Goldberg's testimony. His paragraph 21 couldn't be more to the point. This man faces torture and death because of his career as a pilot and his role in the government and the government's perception of his conduct. Turning then very briefly to the three issues. Does the Kent claim require an enumerated ground for persecution? Or it could just be for any reason it's more likely? Correct. It does not require an enumerated ground for persecution. It is merely whether you face a substantial likelihood of torture. If they wanted to torture him for a currency violation, it wouldn't matter. If there's a substantial likelihood of torture, whatever their motives, you can't send them back. That's why we signed the convention. If Syria would torture him because he pulled some money out of the country without following their law, and there's a probability of that, that permits relief. Absolutely. He'd have to be on a protected ground. Absolutely. That's correct. Touching briefly on the I-246 stay issue. I simply want to highlight the concern we have, and it's elucidated in our motion to supplement. For 22 months, from May 28, 2002, there's been no suggestion by the government that they ever acted on the I-246 stay application, which is, of course, the linchpin of our request for habeas corpus. I don't mean to break your waxing of argument, but I'm going to. What am I missing? It seems like the whole habeas case, now that we're here, doesn't really affect what we're doing, because if we don't give relief on the BIA case, then we shouldn't give relief on the habeas case. I agree in that sense. If we give relief on the BIA case, the habeas case is over. So it might be better for you to let your co-counsel save some time for rebuttal on the BIA case. Agreed. And, Your Honor, that's why I'm going to close up just 15 seconds of comment. I think the significance of the supplemental evidence, which arises under 03, goes to scope of relief. The government seems determined to deport this family, and they're only going one place. That's back to Syria. And that's why we're going to ask you as to the scope of relief, not merely to send this back to the BIA and say, would you reconsider whether you're going to allow reopening, but both to direct reopening, to direct the BIA to submit the whole panoply of claims to an IJ for a full hearing on the merits, and to make the stay that the district court issued under Rule 62 your own stay, with clear directions to the government that there is to be no sudden rush to try to get this family out of the country at the first seeming procedural opportunity. And with that, I will. I have a question. Yes, Your Honor. I read the materials attached to, as I'm sure both Judges Canby and Gold did too, attached to the motion, the supplemental motion, the motion, yeah, the supplemental motion to supplement the record. My reading of that indicated that several members of the family were in detention for some or all of the period of time? Yes, from February 2002 until into the fall, the entire family was in jail. Some of them were released on humanitarian grounds, and then finally the balance including Mr. Hamoui were released at the end of 2002 with a clean bill of health in terms of their behavior, community, lack of criminality, et cetera, on the part of the district director. But yet still no action was taken on the stay request for reasons we've never been able to figure out, and now suddenly they claim they took that action in May of 2002. All right. We will give you ‑‑ you're still at time. I understand. I'm done. We're about out of time. Thank you, Your Honor. May it please the Court, my name is Andrew McLaughlin, and I'm back to represent the respondent or appellee or cross-appellant, depending on which case you're looking at in this case. Mr. McLaughlin, I don't want to get you off your stride right at the start of your planned argument, but to say from my perspective as one judge, I'm not too interested in the habeas case. For the reasons I noted to Mr. King, it seems to me it's a theoretical set of questions that become mooted by what we do in the BIA case. So, you know, if I'm missing something there, you can explain it during argument, but I don't see a need to think in the abstract about some of the technical issues raised in the habeas case, which I think are rendered moot by how we deal with the BIA case. Your Honor, the substance of the habeas case, frankly, is rendered moot by the results of the Petition for Review case. There are two really extremely important issues that arise out of the government's appeal in the habeas case, and that is whether there is jurisdiction at all in habeas simultaneous with this Court exercising its statutory jurisdiction over the Petition for Review. Do we have to reach that issue? If we were to grant no relief in the BIA case and say that's it, and the injunction would then dissolve, would we have to reach that issue whether the court had any jurisdiction? Your Honor, I treat this as an issue of something that's capable of repetition. If the Court fails to address that issue and the issue of jurisdiction to issue a stay in a vacuum under 242G, we will see dual-track litigation on stays forever from this family and others. The government wants the law to be clarified as to whether this can be done. That is correct, Your Honor. Let me turn to the Petition for Review case, since that seems to be where the Court's interest is. It is distinctly possible that the issue will arise again for these people the moment this Court lifts the stay, or eventually when this Court decides the case, we're going to have to go deal with the issue of the stay pending appeal in the district court to make that go away somehow. I thought it just was a stay or an injunction, as the district court called it, until we ruled. Well, that's the interesting point about it. Initially, they issued this stay pending the opportunity to get the opinion of this Court. This Court then denied a stay. Petitioners went back to the district court, and the district court said, well, I'm going to leave my stay in place anyway. So I'm not sure. I haven't looked at exactly what's going to be required to make that stay go away once this Court is ruled. Maybe then I'll just put my issues on the table for you. In the BIA case, they submit affidavits from four credentialed people who say, two of them from University of Washington and two from human rights groups, who say that if this family goes back to Syria, it's more likely than not they'll be tortured. They never had an evidentiary hearing where that evidence was considered. They haven't had those witnesses testify and be cross-examined. They haven't had findings on that testimony. The BIA says, well, the IJ considered all this thoroughly, and it doesn't make any difference. It's about general conditions. But that, to me, doesn't seem like a fair reading of what those affidavits say, because maybe they're self-serving or they're an advocacy. They're kind of a point of view in them. But they are linked to the Emuy family's circumstance. Absolutely. And that's what makes it so easy for the boards to deny it. Remember, this case went up on a petition for review back in 1998, which this Court Absolutely. The finding of the board in that case, and the finding that was echoed again in the Ninth Circuit opinion in that case, is that there is nobody out there anywhere who is looking to harm this particular family in any way, not through persecution or anything else. Mr. Emuy himself was arrested. No, there's no evidence of that in the record at all. Mr. Emuy indicates that he committed a currency violation. The way we affirmed, or I should say denied the petition, was to say there's no indication of persecution on any of the enumerated assets. Right. The opinion of the board and the opinion of the Court specifically said, look, there's no indication of persecution. There's no indication that anybody's out to get these guys. If anybody is going to do anything to these people if they return to Syria, it would be based on the currency violation, and therefore it wasn't persecution. That's what both found. Let me just ask you this, what the government's position is, because I know you're a responsible advocate. So if the government knew that if they went back to Syria, they would actually be tortured because of a currency violation, wouldn't the government say that's what the Convention Against Torture Relief is all about? Absolutely. Okay. So it wouldn't have to be on any protected ground. That would get them out. You're just saying you think the first ruling means that if they go back, they're not going to be harmed. You start from that point. Then you have a motion to reopen in which the petitioner, the person who's moving to that he's right, that something would change, that he in fact would be tortured. Please look at the affidavits that you're referring to. They all refer to, based on his extensive experience, his big file with Syrian intelligence based on being a pilot, all of those things, all of those things were the essence of the asylum claim. There is no evidence in this record, there's none of these experts that say that because of the currency violation, people of his age and experience or whatever circumstances are tortured in Syria. It's simply not there. I think the problem I'm having with that argument is two problems. One is there are different standards. Asylum is different from CAT. So I don't know if you don't evaluate the evidence under the CAT standard as opposed to the asylum standard. Both have the same starting point, however. Somebody has to be looking for you. But we, the Ninth Circuit, didn't previously make a ruling on that point. And it doesn't mean that somebody had, I mean, it's not just somebody, it's that more likely than not he'd be tortured, but assumes it's the government, right? In the case of torture, it must be the government. Right. So we're assuming, right. That's not, there's been no finding on that yet. I mean, it just. No, there's been no evidence presented by the Hamouis that would lead to a finding on that. That's a different issue. Okay, so there's that. And then there's the fact of the three sets of lawyers with clear and effective assistance of counsel, all three disciplined. And so to the extent you're making this argument that, well, the evidence hasn't really been put forward in a proper way, that's rather circular, isn't it? Because. No, not at all. Well, the BIA is saying that they had lousy lawyers, so. We are assuming at this moment that the lawyer who submitted the motion to reopen, who is sitting here in the courtroom, was competent. And she failed to submit any evidence in that motion to reopen that would indicate that the Hamouis are going to be tortured outside of the evidence that was based on, that the previous decision was made on. Except, perhaps, for the opinions of four, you know. That's why I asked you to read those opinions, Your Honor. Every single one of those opinions. But you're saying there's no evidence, and we're saying, well, there's four expert declarations. No. If you read the expert declarations, they are all based on his service as a pilot, his flying for the Vice President. And your pet. This Court has already ruled on that. Based on those things, there is nobody out there anywhere looking to harm the Hamouis. That's what this Court held. Can't an expert witness, if a person, you know, qualifies to give expert opinion, can't they review the same facts that other people reviewed? Absolutely. Based on these facts, it's my opinion. Sure. And then that X, their opinion, is evidence. This is where we get into standard of review questions, Your Honor. A motion to reopen is required to come with the evidence that establishes the prima facie eligibility for the relief requested. In this case, you have a person who was detained for all of those reasons that are cited in the expert evidence, but was not harmed, was not tortured, was not killed, and was not even threatened over it. I'm going to take another look at exactly what the experts said. But I thought that they said, in substance, in my opinion, it's more likely than not that he will be tortured if returned. Several said it's more likely than not. Several said it's a possibility. So why, whether they're exaggerating or not, whether they're politically motivated or not, if they are qualified to give an expert opinion, and certainly at least the UW faculty people are, then why isn't that evidence that would support a CAT claim that has not been considered? Because it wasn't presented in the 1997 proceeding. Your Honor, in evaluating whether or not the evidence exists, the Board was evaluating that against the evidence that already existed in the record. The evidence in the record is all those things had already happened before he left Syria. He was already detained before he left Syria, and none of those things happened. He was never tortured before he left Syria. The only thing that has certainly happened since then, he's been here. That's correct, Your Honor. He left Syria and established residence here for quite a long time. Yes, Your Honor. And doesn't that enter into the statements of the experts? I looked in the statements of the experts looking for analysis of things that had changed that might cause him to be tortured. I simply couldn't find them, Your Honor. The issue of whether or not a person who returns on a currency violation, it's just not there in the expert opinions. The issue of whether or not a person who spends some time outside of Syria or comes to the United States or even files an asylum claim in the United States is subsequently tortured, was just not there in the materials that were put forward to the Board. And what about the fact that he now has a U.S. citizen child? That's changed, hasn't it? Yes, Your Honor. That wouldn't make any difference? There is not any evidence in the record that indicates that a person who has – Now, let me go back. He had a U.S. citizen child before he left Syria. Right, but that's not discussed in this opinion. I mean, I guess the problem, the fundamental fairness issue here is he's never had a hearing on the merits of this claim. Your Honor. And I'm interested to see how you respond to this fact. The only hearing he ever had was before Catt was even enacted into law. Yes, Your Honor. So how can you tell us he's had a hearing? It's all been considered. The hearing that's required in this kind of a circumstance is a motion to reopen hearing by the Board. It is notice and an opportunity to be heard. It is not an evidentiary hearing. It isn't testimony. It isn't any of those things. The burden is specifically placed on the alien to bring forward the evidence that will show the Board that it needs to be reopened. In this case, the Board evaluated that and found it wasn't. I realize they've evaluated it, but we have to review it. And if the affiants say, more likely than not, he'll be tortured, why doesn't that prima facie establish the likelihood of torture, unless or until somebody cross-examines them and a finder of fact says, well, I don't believe them, I'm going to believe a different witness? In the situation where the general country conditions say there's a lot of torture out there and the specific experience of this person with all of those criteria that the experts were experting about indicates that he's not going to be tortured because he wasn't under the circumstances where he was under their control previously. And there certainly isn't any evidence of changed country conditions in Syria that would indicate that he's more likely to be tortured now than he was then. That wasn't offered by the Humorees either. The fact is the Board did exactly what it needed to do. It evaluated that against something that was fairly overwhelming in this case. That is, they were not he was not previously tortured under the exact conditions that the experts say would make it likely. He wasn't tortured before. He wasn't even persecuted before, according to the first hearing. And the underlying facts that the experts are relying on haven't changed. The question, I guess, is whether just their adding their say-so to it changes things. The position of the Board in this case is we can get as many country condition statements as you want. And that is how they view these. These are people who are standing back from a distance and say, Hey, if you had a guy who used to work for the Syrian Air Force, any chance he'd be tortured? Sure. Why not? But the statements didn't say if you had a guy that would happen. Right. I mean. Well, actually, fundamentally, they did. Lawyers, too, just like the U.S. has lawyers. And so the statements say that Mr. Humoree, is that pronounced right, Humoree, will be tortured more likely than not if he goes back. So I don't see the BIA tackling that head-on at this opinion that's in the record at page 4. I mean, if the BIA confronted that and said, Here's what the experts said, and then they had, like, a good answer to that, I could give it more weight than the way they've dealt with it here. They pretty much just seem to have brushed past it. By saying this was all fully considered in the I.J.'s decision, I.J. had 6 to 18, but that decision obviously didn't consider what these people said. It considered exactly what the experts said. It considered the underlying stuff that these experts said. The reasons why the experts said that Mr. Humoree would be tortured are exactly the reasons that the I.J. considered. And based on that, the I.J. concluded that there is no indication from the record that anybody in Syria wants to harm Mr. Humoree. Period. And the Board said that was the case. And the Ninth Circuit agreed with that based on the evidence that was in the record. I have a question for you. And I know that we have rolled this way in the past, so I know I personally have issued opinions where we send it back to the Board where they did not apply the correct CAT standard. And I just want to hear what your response would be, because I'd rather hear it now than hear it in the PFR petition. But here, what the Board said was we do not find that this evidence, even if supplemented by expert testimony, establishes that the lead Respondent will be tortured. But that's not the CAT standard. So my tentative inclination would be to say the Board applied the wrong standard of law. Actually, no, that is the CAT standard, Your Honor. More likely than not, isn't it? No, the actual language of the statute and of the Convention Against Torture says you can't send a person back where they will be tortured. The subsequent interpretations of that, including in the regulations and the cases, interpret will be tortured to be more likely than not. Well, that's my understanding of the law. So if that's the understanding of the law, if that is how the law has been interpreted, then that's the law. Your Honor, I find it hard to penalize the Board for quoting the actual regulation. But we're saying, we'd be saying the Board applied the wrong standard of law. That equals abuse of discretion under the abuse of discretion standard. Your Honor, I don't think there's any evidence at all that the Board applied the wrong standard of law. They quoted the correct standard. They didn't define the standard further as it has been defined. In answer to both of your questions, I think you'll be better informed if you look at the Immigration and Naturalization Service. Was it still the INS? Yeah, it was still the INS then. The Immigration and Naturalization Service's brief on the motion to reopen, which it appears to me that the Board is kind of saying, yeah, I agree with that, with what you said there about, and in that they deal with the more likely than not standard. We review briefs. We review decisions. We have to look at what was said. Understood. But what was said is literally the standard that comes out of the convention. My problem isn't with the standard. At least I think I understand what your position is on that, and that's not troubling me. What's troubling me is just the application of it, where the Board says the claims were fully analyzed in the IJ's decision, but the current claims weren't. I mean, the underlying circumstances were, but the IJ didn't analyze what these experts say. And so I'm wrestling with whether just tacking on the expert opinion to the prior evidence is sufficient to compel the BIA to send it back for further hearing. Your Honor, there is no doubt, based on the record, that torture occurs in Syria. The question that the Board is required to struggle with is whether or not the evidence indicates that it's more likely than not. You've established that whether the evidence that's offered in the motion to reopen establishes that it's more likely than not that a person will be tortured if they go back. Therefore, they looked at those opinions. They looked at the criteria, the specific items that the experts listed as the basis for their reasoning. They found that the immigration judge had also reviewed those exact same standards, those exact same criteria, and the immigration judge specifically found that no one was going to harm these people. And I would suggest to the Court that that would subsume, that analysis subsumes torture. Ginsburg. I'm sure you're familiar with Camalthus. Yes, ma'am. Right. There we said that under a CAT claim that the Board abuses its discretion when it fails to recognize that country conditions alone can play a decisive role in granting relief under the Convention. So I'm wondering where in the BIA opinion it actually analyzed these country condition reports that were in the record. What the Board did in this situation was compare the evidence that was offered by the most significant thing that they found was this, the only significant evidence that was offered was completely rebutted by the actual experience of the alien in Syria. If there's nothing further, I have nothing more. Thank you. A few points. First, let's put aside this notion that the experts were general and not specific. This is all right. We'll put that aside. But I would put aside this. If you have underlying evidence that the Board has considered and the experts review all that same evidence and then they add their opinion, is that enough to require a hearing? No, because the reasoning of the Board on its face is, I'm sorry to put it this way, Alice in Wonderland. They point back to the IJ and the 1996 hearing. There was no evidence about Hama. There was no evidence about Mr. Hamoui's insider knowledge. The word torture is not going to be found in the transcript. The word torture was not found in the IJ's ruling. The word torture was not found in this court's ruling. Judge Canby asked, well, wasn't our ruling in 2000 based on something else? It certainly was. It was based on the notion that a case for political persecution was not made out. That's what you talked about in 2000. And you didn't talk about torture or a cat claim for two reasons. Number one, because literally a cat claim wasn't available. And number two, because even in the context of an asylum claim, Mr. Hall and his incompetence didn't bring the evidence out. Judge Wardlaw emphasized fairness here. And that is the critical point. Fairness. To say that there was a fair hearing and consideration on the motion to reopen of claims that didn't exist, of the expert testimony, when the board says, well, you've got to show he will be tortured, which is plainly not the standard. When the board says, well, all of this was in front of the IJ, when it plainly was not. I mean, the board can make statements over and over again. But if those statements fly in the face of the facts and the record, then we need the relief. These people have not gotten an opportunity to make their case through competent counsel. This is one of those fundamental points of fairness that for a century our law has guaranteed to aliens. Due process. They didn't get it here. Incompetent counsel. De novo review of the board's determination is what controls. And we have made out the case necessary for relief. If there are no further questions. I. There certainly is plenty in our prior decision to nine review. That focuses on the ground of persecution. But it all. We also say fear of persecution. See how we testified that he feared he would be imprisoned or executed upon his return to Syria. However, the only basis for that fear is the criminal prosecution he would face for his violation of Syria's economic laws. And then they say, well, that's not persecution. Exactly. But that's a little ambiguous. And that's why, Your Honor, if you have any doubts about that, go back and look at that record. Look at. And it's in the AR. It doesn't. It's not that long. The transcript of the testimony, the questions he was asked by Mr. Hall, admitted to be inept. The facts weren't brought out. There's not a question there about Hama. There's not a question there about his being an insider. There's not an evaluation of torture. There's that issue wasn't presented. And then we have the additional factor that a cat claim wasn't even as such available. It wasn't brought out. It wasn't explored. It wasn't an issue. Is there anything in the expert testimony that would postdate what the time that the immigration judge heard the evidence? Yes. Your question raised that point. And I think that, for example, Mr. Gold – and, Your Honor, if I could just go on here and respond to the question. I realize that my time has long since expired. I'll respond to the question. If you look at Mr. Goldberg's testimony, for example, his conclusion on page 21, he emphasizes the residents and the circumstances of the time. And I think even more to the point is – and here I'm having one of those moments where I'm wondering if I brought the right paper up with me. It's Ms. Sherry's, Ms. Kerry's declaration. She specifically discusses the length of the duration of the stay here. When – they went before the IJA. It was 1996. They'd only been here for four years. There's been a lot of water under the bridge. I don't know whether a cutoff occurs back when they should have made a CAT claim, but didn't for ineffective assistance. Actually, the cutoff on the CAT claim would go back to 1999 at the point where it was first available. There's also the principle that you look at – yeah. You also look at the principle of further evidence that's been developed. And there is in the record, certainly on the 03 side, it couldn't be available on the 02 side because this evidence wasn't available because it didn't exist until late in 2002. The fact that the asylum application, as it's been characterized, has been publicized in the Arab press. I mean, in the functional equivalent of the New York Times for the Middle East. And there is specific testimony in the habeas corpus record which goes to the fact that this has caused agitation and consternation and concern for the safety of the remaining Hemeli family members that are in Syria. The Syrian government in 2000, when it was time for voluntary departure, and I will finish on this point, and the family put in for passports, all of them were given general passports but one person. Mr. Hemeli, he was given a laissez passport one way back to Syria. That's the only place he could go. I think it's a fair inference. We have a pretty good idea why the Syrian government did it that way. We would ask you to reverse and send it back for a full and fair hearing and to put the stay in place as this court stay, pending those procedures. Thank you. All right. Thank you, counsel. Good argument on both sides. Difficult case. It will be submitted, and we have previously submitted on the briefs the United States versus Robert Lynn and Daryl Schaefer versus Miller Stepp. And with that, we will adjourn this session of the court. All rise. The court will discuss and stand adjourned. Thank you. Thank you. Thank you. Thank you.
judges: Canby, Wardlaw, Gould